## Richmond.

### BARBOUR v. DUNCANSON'S ADM'R.

January 25th, 1883.

1. EVIDENCE.—Declarations of assignor after assignment are inadmissible in evidence against his assignee.

2. PAYMENT.—B. bought land of D. in November, 1857; assumed lien of $1,644.20, and gave three bonds for $1,118.60 each, payable in one, two and three years. D. was poor, and the land encumbered. D. assigned second bond to K., in payment of debt, and third to M., as collateral for land, and retained the first. It is conceded that the second was paid to K., and the evidence tends strongly to the conclusion that the first was paid in money to D. The contest was as to the payment of the third. Of its assignment, B. had no notice till December, 1860, when he wrote M. that it could not be paid until the land was cleared of liens, of which he had paid many. Nothing occurred until 9th May, 1866, when M. notified B. that he had assigned third to H., with receipt given B. by M., when B. endorsed note of $400 for M., which receipt recited that M. held said bond, that B. claimed it had been satisfied by paying off liens, and that M. agreed to make up to B., if he paid said note, whatever the amount still due on the bond failed to pay of the note, and spoke of M.'s destitution. Suit was brought on the third bond in May, 1868. During the war B.'s papers were lost. He plead payment and set-offs; suit dragged until 1877, when it was referred to an auditor to pass on the payments and set-offs, and determine what was due. He reported credits to B. for liens discharged in excess of third bond, but doubted if they should not be applied to first. Before this reference, D. and M. had both died, and B. became incapable of testifying. Court below gave judgment for the amount of the third bond against B. On error;

HELD:

> The facts established by the evidence warrant the conclusion that the third bond was fully satisfied by B. by the payment of liens on the land, and that such would have been the testimony of D., had he lived until the trial.

Error to judgment of circuit court of Fauquier county, rendered 19th April, 1880, in action of William Duncanson's administrator for use of J. J. Halsey, against John S. Barbour, on a bond for $1,118.60, with interest from November 1st, 1857. The opinion fully states the pleadings and the facts.

*G. D. Gray* and *W. H. Payne*, for the appellant.

*R. T. Scott* and *J. W. Green*, for the appellee.

LACY, J., delivered the opinion of the court.

This case is before this court upon a rehearing, and is an appeal from a judgment of the circuit court of Fauquier county, rendered on the 19th day of April, 1880, in a suit brought in the name of William Duncanson for the benefit of J. J. Halsey against John S. Barbour, at May rules, 1868, of Culpeper circuit court, to recover of said Barbour the amount of a bond executed by said Barbour on the first day of January, 1858, for $1,118.60, due the first day of November, 1860, with interest from the first day of November, 1857.

The case as disclosed by the record is as follows:

On the 17th of October, 1858, Duncanson transferred this bond to Jeremiah Morton, to be held by said Morton as collateral security for a debt due by Duncanson to Morton, for the purchase of a tract of land, named in the record "Bushy Park," at $3,025, and $60 due for guano, evidenced by the two bonds of the said Duncanson, dated November 2, 1857, each for the sum of $1,542.50, and payable respectively December 1st, 1858, and December 1st, 1859.

In December, 1860, Morton notified Barbour that this bond of Barbour to Duncanson for $1,118.60 had been assigned to him, the said Morton. This bond had fallen due November 1st, 1860. Barbour at once replied by letter, which is in the record, filed and relied on by the appellee, in which letter he says:

"The bond referred to (in your favor) is the *last one* on my pur-
chase of land from Mr. Duncanson, and cannot be paid until
the land has been freed from *all* incumbrance and deed made
pursuant to contract."

This letter is largely relied on by appellee to show that no part
of this bond, the subject of this suit had been paid. Barbour
says further, "There have been several judgments against Dun-
canson binding this land, some of which I have paid," and
after reference to other liens on the land says: "There was also
a deed of trust upon which I had to pay. *Of course I must
take care of myself in these matters before I can assume to pay
you or any assignee of Duncanson."* This was strange language
to be used by Barbour to Morton, who held his bond of $1,118.60,
then due and payable upon its face, if, as the circuit court of
Fauquier has decided in this case, every dollar of that bond was
due and unpaid at that time. That was in December, 1860,
Duncanson was not dead *then*—Morton was *living*, and both
bonds for the purchase of *Bushy Park* had then *fallen* due ; all
the liens of every sort upon the lands purchased by Barbour of
Duncanson, were of record in the clerk's office of Culpeper county,
whether these liens were docketed judgments or trust deeds.
If the circuit court is right in its judgment in this case, this
letter must have been *startling* to Morton, and it is not a vio-
lent presumption, that Morton went with this letter without
unnecessary delay to Duncanson, his debtor. If the bond in
dispute was entirely unpaid, Duncanson must have been *indig-
nant.* It *represented to Duncanson,* a large sum of money, which
stood between him and destitution, if it was wholly due and un-
paid. Under those circumstances there was a strong motive to
impel Duncanson to action, and one equally strong to move
Morton to action. We would expect to find suit commenced
without delay—the courts were not closed—but what do we
find from the record ?

This refusal of Barbour to acknowledge one dollar of indebt-
edness under this bond did not cause any suit against him.

Morton pocketed his bond and his disappointment as well. Duncanson, with a trust deed upon his home, said nothing, did nothing, although if Barbour's statement was untrue, and the whole bond was due, there was nothing easier than to prove it. Yet nothing is said or done until in the month of May, 1866. Many years after Morton addressed a letter to Barbour, in which he says: "I have assigned your bond to J. J. Halsey, and filed a copy of my receipt to you when you endorsed my note to Riggs & Co. for four hundred dollars. My note will fall due on the 9th and 12th of July, and as I am to make provision for any *deficiency* which may be—if on a settlement it should turn out that judgments, &c., liens on the land of Duncanson—when you executed said bond, and as I have NO *money*, should have to *struggle hard to find* ANY, I hope you will at the earliest day notify Mr. Halsey when you will be prepared to adjust the said matter, with the kindest feelings to you I hope, as I think you are mistaken, and Duncanson is correct. At all events let us ascertain it as soon as possible," &c. Now if Duncanson and Barbour differed as widely as the appellee insists, this was a singular and remarkable indulgence on the part of these creditors toward so stubborn a debtor as Barbour seems to have been. In 1860 he says he will not acknowledge a dollar of responsibility on this bond until the liens are all cleared away from the purchased land; and although nearly six years after he still stands to his assertion, and will not even lend or advance a dollar on this debt until Morton has bound himself in writing to refund if the bond shall turn out to be more than paid. No steps are taken by Morton or Duncanson even at this time; and it would seem that the destruction of all the evidences of debt growing out of the four years of war, together with their own consciousness of waning life, would have admonished them that if the wide difference which divided their position from Barbour's was ever to be settled, nothing could be gained by delay. No suit is brought on this bond until May, 1868, nearly eight years after Barbour had put them to their proofs by his letter

of 1860. In the meantime Barbour's private papers had been rifled and destroyed by the public enemy, and he would be put to inconvenience and perhaps be confronted with insurmountable difficulties in showing his payments. Forthwith, however, in June, 1868, we find Barbour pleading in the case, and pleading substantially as he had written in 1860, that the bond had been paid in various ways and various forms of payment, and as the suit progressed offering evidences of payments on account of Duncanson, which more than paid the bond sued on. And possibly in this fact we may find some explanation of the very singular history of the progress of this case as disclosed by the record. The suit was brought May, 1868—issue was made in June, 1868. The next step was in 1871, when it was sent to the county court of Culpeper. Why was nothing done with it from 1868 to 1871? In 1872 Duncanson died. His mouth was closed by death. Barbour's mouth was then closed also. Upon the main question, how much had he paid on account of this debt to Duncanson? In 1873 the case is sent back to the circuit court. In 1874 it is transferred to the circuit court of Fauquier, and there it slept until 1877. An auditor was appointed in 1877. His first report was made in April, 1878—his second report December, 1878—and his third report 1879.

Why was this delay? Duncanson could have explained the true state of the bond to Morton, and doubtless did so in 1860, when Barbour first refused its payment. What was that explanation? We are left to conjecture. But can it be fairly presumed, under these circumstances, that the explanation of Duncanson to Morton was to this effect: "Not one dollar of that bond has been paid, and not one dollar is necessary to be used to pay judgment liens or trust deeds on my land sold to Barbour. All these liens have been provided for, and more; and Barbour owes me this entire bond, principal and interest?" Such a presumption is absolutely precluded by the history of this case, as we have seen it disclosed by this record; and yet that is the judgment of the circuit court in this case.

Thus presented, the decision of circuit court seems to be unwarranted. Let us briefly examine the history of this suit upon all the facts. When Barbour in support of his plea of June, 1868, had produced and proved evidences of payment on account of Duncanson, which together with the $400, paid for Morton to Riggs & Co., overpaid the said bond, principal and interest, to the amount of $171.20, the plaintiff in the suit below, the defendant in error here, objected to the credits being allowed as off-sets, upon the ground, that while it did appear that Barbour had paid these several sums as shown by him, they were not properly applied as credits on this bond, because *these payments on account* of liens on the lands purchased of Duncanson, should be applied as credits on another bond for the purchase of this same land which had fallen due twenty years before. Why did not Duncanson say this while he was living ? He *knew;* if such was the fact why did not Duncanson disclose this fact to Morton, his creditor, and if he did disclose it to Morton, why did Morton on the 9th day of March, 1866, write and sign and seal the following: "Whereas, John S. Barbour has endorsed a note of mine of equal date with this, viz: 9th March, 1866, for the sum of $400, payable four months after date, and discounted for me by Messrs. Riggs & Co., Washington; and whereas, I hold a bond of his executed by him in favor of William Duncanson for land purchased and assigned by the said Duncanson to me; now as the said Barbour thinks he paid judgments, &c., against Duncanson, which were liens on said land, and which are just off-sets against said bond, so that there may not remain enough in his hands to meet said note, discounted by Riggs & Co., then, in that event, I promise to meet said *deficiency,* either in whole or in part." If the judgment of the court below in this case was right, Duncanson was obliged to know it, and if he knew it he told Morton.

If not before, certainly *now,* when Morton is so hard run, and so pressing upon him, the said Duncanson. If he told Morton that this entire bond was due, Morton would not have used such

language as this: "I promise to meet said deficiency either in *whole* or in *part.*" If these payments are applied to this bond, which Barbour has proved in this case, then Morton, under his promise, was to refund $171.20 on account of this payment of $400, a difference of $228.50; and if the interest is considered from one period to the other, we see at once how very close the matter stood between the parties, when, in 1860, Barbour refused acceptance of the bond in the hands of Morton; and we have a ready explanation of the extreme silence with which both Morton and Duncanson treated his said non-acceptance for so many years, and of the *deferential consideration* with which Morton treated Barbour's assertions, even after *Morton* was reduced to *extreme poverty*; and, to use his own forcible language, "I had NO *money,* and would have to struggle hard to find ANY," upon the claim being set up, after the death of Duncanson and Morton also, for it is stated that Morton is also dead. It is claimed and, so far as we can see, for the first time, pretended that these payments, whatever they are, have no relation to the bond held by Morton, but apply to another bond.

If this claim had been set up by Duncanson, Barbour would have been on equal terms—both living—but as we have seen, it is set up only after Duncanson's death.

This brings us to consider the history of the other bonds in this case. On the first day of January, 1858, Barbour executed three bonds to Duncanson, each for the sum of $1,118.60, each to bear interest from November 1st, 1857, and payable respectively November 1st, 1858, November 1st, 1859, and November 1st, 1860; they make together $3,355.80, and Barbour assumed the payment of a lien on the land of Duncanson of $1,644.20, which, together with the amount of the three bonds, make the amount of $5,000.00, which was the entire purchase-money for the land bought of Duncanson. The testimony in the case, *not exceptionable,* shows, that the second bond was assigned to Kelley December 22d, 1858, by Duncanson, which is admitted on both sides, with a credit on it for $140, when assigned.

This bond, it is conceded, Barbour has paid; if Barbour had not paid the first bond, why not put this credit of $140 on the first bond instead of the second bond? The third bond was the first bond assigned, as we have seen, that having been assigned as collateral security to Morton, in October, 1858. The first bond has not been produced in this case, and as it is not claimed to be now due, or any part of it, to the appellee, it may be regarded as a *concessum* that it has been paid in some way, for the purposes of this case. Appellant says it was paid in money, appellee that it was paid in judgments, &c., liens on this land.

What is the testimony? The witness, Gray, says that early in the year 1858, in the month of February, Duncanson and Barbour procured his services to state all the claims, which were liens on this land bought by Barbour, in order that Barbour might know whether he could safely pay the first bond in money, that is whether the two second bonds were sufficient to secure the liens on the land; that the result was the conclusion that the two last bonds were ample, and that it was decided that Barbour could, without risk, pay the first bond in money, and it was so agreed between Barbour and Duncanson.

The witness, Gibson, testifies that in June or July, 1858, Duncanson told him that he was going to get the money on the first bond from Barbour, and pay him some of it; that shortly afterwards he told witness that he had gotten the money from Barbour on his first bond, and that Duncanson offered some of this money to him, and that he saw it.

The deposition of Edwin Barbour is objected to, so far as it gives evidence of the declaration of Duncanson after assignment of bond. This objection is well taken, so far as it effects the declaration of Duncanson concerning the bond which he had assigned. They are not against interest, and cannot be received, being mere hearsay; but so far as these declarations go to the bond not assigned, and so far as they are against interest, and admit the payment of the first bond by Barbour to Duncanson himself, it would seem to be otherwise; and also as

to the fact that Duncanson executed a deed for the property which bears date November 14th, 1866. In view of the facts thus disclosed in this record, the auditor reported that the first bond had never been paid by Barbour; and after he had read the deposition of the witness, Gibson, he still believes that he was right in his views; and as to the statement of the witness, Gibson, who was the family physician of Duncanson, he leaves to the court to decide whether it proves payment of the first bond, &c., and makes alternate statement. The court below seems to have rejected the testimony of this witness and that of all others upon this point, and decides that the bond sued on here is entirely unpaid, and gives judgment accordingly.

We are of opinion that the said circuit court erred in so deciding, and are of opinion to reverse the said decree of the said circuit court. The following order will be entered:

The court is of opinion, for reasons stated in writing and filed with the record, that the judgment of the said circuit court is erroneous. It is therefore considered that the said judgment be reversed and annulled, and that the appellant recover against the appellee his costs expended in the prosecution of the writ of error and *supersedeas* here.

And this court now proceeding to render such judgment as the said circuit court should have rendered, it is further considered by this court that the plaintiff takes nothing by his bill, &c.; that the defendant go thereof, without day, and recover his costs by him expended in defence of this suit in the said circuit court.

DECREE REVERSED.